UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17 CR 44 SNLJ (ACL) |
| | ) | |
| RASHEIK AMOND HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is Defendant Rasheik Amond Harris' Motion to Suppress Evidence and Statements (Doc. 25) obtained after he was approached by an officer for driving without a license. Harris argues that he was unlawfully arrested after parking in a driveway. (Doc. 40 at 2-3.) He further argues that his statements were made under duress. *Id*. at 3. Specifically, Harris claims that he confessed to possessing drugs so that his girlfriend would be released from jail.

Harris also filed a Motion to Dismiss Indictment (Doc. 57) claiming that the "Indictment is vague,. . ., and does not contain a plain,. . .written statement of the essential facts constituting the alleged offense. . ." *Id*. at 1. More particularly, Harris complains that the evidence presented to the Grand Jury was inadequate, it was inconsistent with information in police reports, and it was secured in reliance on hearsay and evidence that should be suppressed. *See generally* Doc. 42. The Government filed pleadings in Opposition. (Docs. 47, 62.)

An evidentiary hearing was held (Doc. 30) during which three Sikeston Department of Public Safety Officers testified—Captain Andrew Cooper, Officer Benjamin Quick, and Detective Bobby Penrod. The officers were cross-examined extensively by defense counsel.

The parties filed post-hearing memoranda (Docs. 40, 41, and 47), after which the matter was taken under submission. Based on the testimony and evidence adduced and having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that the Defendant's Motions be denied.

**Additional Background related to Pretrial Motions**

In an earlier scheduling Order (Doc. 63), the undersigned mistakenly referred to the "Memorandum in Support of Defendant's Motion to Suppress Evidence and Statements" (Doc. 40) as having been filed by the Defendant, *pro se*. The Defendant was originally represented by the Federal Public Defender. Following the suppression hearing, the Defendant filed *pro se* pleadings that resulted in the scheduling of a status hearing (Doc. 48) to determine whether additional evidence needed to be submitted to the Court. As a consequence of the hearing, the undersigned found that there had "been a complete breakdown in the attorney client relationship" (Doc. 50 at 2), which resulted in the appointment of new counsel to represent the Defendant. In a separate Order, the undersigned addressed various correspondence (Doc. 42) the Defendant filed *pro se*, including: a Motion to Withdraw earlier Motion to Suppress, *id*. at 5-6, a Motion to

Suppress Evidence and Statements and Memorandum in Support, *id*. at 7-10, as well as a Memorandum of Points and Authorities, *id*. at 11-14. The Court noted that:

> the Defendant also filed a *pro se* Motion to Quash and Dismiss Grand Jury Indictment (Doc. 35) on August 21, 2017. In regard to the Defendant's filing of *pro se* motions, he is reminded that he is represented by counsel and clearly stated on the record that he does not want to represent himself. As a threshold matter, "[t]here is no constitutional right to simultaneously proceed *pro se* **and** with benefit of counsel." *United States v. Agofsky*, 20 F.3d 866, 872 (8th Cir. 1994) (emphasis added). The Defendant is advised that any future motions or requests must be filed by his appointed attorney. *See Abdullah v. United States*, 240 F.3d 683, 686 (8th Cir. 2001) ("A district court has no obligation to entertain *pro se* motions filed by a represented party.").

The Defendant's second attorney adopted the Federal Public Defender's Motion to Suppress (Doc. 25) and Memorandum in Support (Doc. 40). He also filed a Motion to Dismiss Indictment (Doc. 51) wherein he incorporated the Defendant's *pro se* correspondence (Doc. 42) related to pretrial motions.

## I. Findings of Fact

Harris is charged with possession of more than fifty grams of methamphetamine with the intent to distribute and possession of a firearm by a previously convicted felon. (Doc. 2.) Harris has four prior felony convictions—two related to trafficking controlled substances, one for Second Degree Burglary, and one for Unlawful Possession of a Firearm. *Id.*

On March 9, 2017, Sikeston Department of Public Safety (DPS) Captain Andrew Cooper was on duty and approaching an intersection, shortly after two in the afternoon, when he observed the Defendant drive through the intersection in a Chevy Tahoe.

Captain Cooper had known the Defendant for more than a decade. He knew the Defendant as "Rocky" Harris and that the Defendant's first name was Rasheik. Harris caught Captain Cooper's attention at the intersection, in part, because Cooper knew Harris had been arrested for driving while suspended just two months earlier in the exact same vehicle. Captain Cooper decided to follow Harris and called Dispatch to verify the status of Harris' license. If Cooper was able to confirm that Harris' driving privileges were suspended, he intended to arrest Harris.

Captain Cooper followed the Tahoe and watched the vehicle park in a driveway two blocks away from the intersection where he initially saw the Tahoe. As the Tahoe stopped on its own, Captain Cooper simply parked on the street near the driveway, not blocking the vehicle, and walked up to the Tahoe to speak with Harris. Cooper asked if Harris had a license and Harris replied he did not. Harris was in the driver's seat, his girlfriend was in the front passenger seat, and a second male was in the backseat.

Detective Mario Whitney arrived to assist Captain Cooper with the interaction. Within a couple minutes, Dispatch reported that Harris' license was in fact suspended. Detective Whitney opened the driver's door and told Harris to step out because he was under arrest. When the driver's door was opened, Detective Whitney saw a firearm inside the driver's door compartment; he instructed Harris to not reach for the gun. Harris complied and he was handcuffed. Harris was in possession of approximately $1,700.

Another officer, Benjamin Quick, was standing on the passenger side of the Tahoe. When the gun was found, Harris' girlfriend told Officer Quick that she did not know there was a gun in the car. She was the registered owner of the Tahoe. Officer Quick asked the girlfriend if there was anything else in the car that was illegal or might be harmful to the officers. The girlfriend said there wasn't anything else in the vehicle. As the registered owner of the vehicle, the officers asked her for consent to search the Tahoe. The girlfriend consented to a search of her vehicle.

Detective Bobby Penrod searched the Tahoe. A Crown Royal bag was observed in plain view on the center hump of the floor board between the driver and passenger. Several bags of suspected controlled substances were found, some of which were located in the Crown Royal bag. Detective Penrod believed the substances were methamphetamine and crack cocaine. Lab tests later reflected that the substances included methamphetamine, heroin, and a non-controlled substance.

The rear passenger had a warrant out for his arrest and he was arrested. All the occupants were taken to the police station. Harris agreed to participate in an interview. The Sikeston DPS "Miranda" form provided:

1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and have him/her present with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

5. You can decide at any time to exercise[] these rights and not answer any questions or make any statements.

(Gov't. Ex. #1.) Harris placed his initials below the warning acknowledging that he understood the rights that had just been read to him. Next, he placed his initials beside the yes in response to the question, "Having these rights in mind, do you wish to talk to us now?" Harris then signed his first and last name as the "person advised." Detective Penrod signed the form, as well.

After having been advised of his rights, Harris engaged in discussion with the officers. He persistently denied knowing the gun was in the driver's door compartment. He also denied knowledge of the drugs except for a blunt with marijuana. Harris debated with the officers about what charges they would file against him. The officers indicated that bags containing controlled substances were found in two different places and that the evidence seemed to show both Harris and his girlfriend were in possession of drugs with the intent to distribute. Harris replied he didn't know anything about that. When the officers were tired of listening to what they characterized as Harris' lies, they began to exit the interview room.

At that point, Harris asked what he would have to do for his girlfriend to be released. Both officers replied that honesty was all they wanted. Detective Whitney explained:

> If you want to start this over and be honest with us then I'm more than happy to listen, but if you're going to go through this same thing where you're lying to us—no, can't do it.. . .

(Gov't. Ex. #2 at 3:15:40.) Harris replied, ". . .then, you gonna let her go?" *Id*. at 3:15:45. "I can't tell you that, but I can tell you that will look a lot better for her if you're honest with us." *Id*. at 3:15:49. Harris then began to suggest that he might "take" responsibility for things in addition to the gun. Detective Whitney interrupted and said:

> It's not about you taking a charge, it's not about you trying to cover for somebody, it's about honesty. All we want is the truth. We don't want somebody to say that they did something that they didn't do. We don't want somebody to say that they didn't do something if they did it. We just want the truth.

*Id*. at 3:16:04. Harris suggested that since the Tahoe belonged to his girlfriend he wouldn't be responsible for the items found in the vehicle. He was hesitant to "take" anything besides the gun. The officers responded that since Harris was the driver and the gun was in the driver's door compartment, they viewed him as being in control of the firearm.

As to Harris' inquiry regarding what he would have to do for his girlfriend to be released, Detective Penrod explained the situation multiple times, including:

> "You know there's only one way that she won't be involved is if you tell the truth--and she wasn't involved. *Id*. at 3:18:31.
>
> "If she's not involved, she's not involved." *Id*. at 3:18:45.
>
> "Well, just because you tell me everything is yours, I can't let her go because of that." *Id*. at 3:19:41.

Harris replied, "Why can't you?" Detective Penrod answered, "Because you're going to have to tell me the truth, the whole truth, every question I ask you need to answer it." *Id*. at 3:19:48. Harris reiterated he did not want his girlfriend to go to jail. Detective Penrod

stated that "if she's not involved, she won't go to jail." *Id*. at 3:20:03. Harris said, "She ain't involved." *Id*. at 3:20:04. Detective Whitney added, "if she's not involved and you tell us the truth and we can determine she's not involved, she ain't going to be here." *Id*. at 3:20:08. Harris then said, "She ain't—she ain't involved. . .she ain't." *Id*. at 3:20:15.

When Detective Penrod restarted the interview with the aim of Harris telling the truth, Harris indicated that he told his girlfriend to say he'd picked her up from work but that wasn't true; he explained "I told her to make all that up." *Id*. at 3:21:05. He then admitted that he purchased some drugs[1] in Sikeston the day before to take to St. Louis, and that he picked up four ounces of methamphetamine in St. Louis. He also indicated that after receiving the methamphetamine, he smoked some of it with other people. Harris returned to Sikeston on the day of his arrest. He admitted there was methamphetamine in a Crown Royal bag on the floor of the Tahoe.

When Harris was asked about the second bag of methamphetamine that was in his girlfriend's purse, Harris replied "I probably put it there." *Id*. at 3:27:26. Detective Penrod said "probably" wasn't sufficient as the presence of two ounces of methamphetamine and scales in the girlfriend's purse suggested she was also selling. Harris laughed about that assessment. The officers pressed Harris on other issues. Although Harris shared some information, he opted not to tell the whole story.

Harris now requests suppression of the evidence seized and statements he made.

---

1 There was some debate about what type of drug was in one of the bags. The officers believed it was crack cocaine. Harris seemed to know otherwise as he stated the need for "DNA" which the undersigned interpreted as testing to verify the substance. Later testing revealed that in addition to the large quantity of methamphetamine that was seized, one baggy contained heroin, and another contained no controlled substance.

## II. Conclusions of Law & Recommendation

The first issue raised by Harris is that he was unlawfully arrested for driving while his license was suspended and that officers did not have legal cause to search his girlfriend's Tahoe. Finally, he claims that he was under duress when he made admissions regarding the drugs found in the Tahoe.

The undersigned concludes that Captain Cooper had probable cause to stop Harris for a perceived traffic violation. Upon confirming Harris' driving privileges were suspended, the arrest of Harris was lawful. While arresting Harris, an officer observed a gun in plain view and the owner of the Tahoe consented to a search of the vehicle. After Harris' arrest, officers read the *Miranda* warning to him. Harris' desire for his girlfriend to be released from jail was not used to force him to confess. Consequently, all the evidence seized from Harris and the Tahoe along with his statements are admissible at trial. A more thorough analysis follows.

### II.A. Arrest of Defendant for Traffic Violation

The Eighth Circuit has repeatedly held that "*any* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001) (emphasis in original). *See also United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc); *United States v. Mallari*, 334 F.3d 765 (8th Cir. 2003).

"To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." *Jones*, 275 F.3d at 680. An officer is justified in stopping a motorist when the officer "objectively has a

reasonable basis for believing that the driver has breached a traffic law." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996). *See United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (officer's mistaken belief, but objectively reasonable basis for believing, that a traffic violation occurred supported traffic stop). Moreover, subjective intent is not determinative in deciding whether the stop was reasonable. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

If an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (quoting *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990)). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." *Id*.

**"**Moreover, 'if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995) (quoting *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)).

Insofar as the Defendant made statements following a traffic stop, those statements should not be suppressed. The Supreme Court has compared routine traffic stops to *Terry* stops.

> [T]he usual traffic stop is more analogous to a so-called "*Terry* stop,". . ., than to a formal arrest." Under the Fourth Amendment, we have held a policeman who lacks probable cause but whose "observations lead him to reasonably suspect" that a particular person has committed, is committing,

> or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881. . ."[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Ibid*. (quoting *Terry v. Ohio*. . .) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984) (citations omitted). *See United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003), quoting *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir. 1986) ("No *Miranda* warning is necessary for persons detained for a *Terry* stop.").

As to the lawfulness of the stop, Harris asserts that Captain Cooper could not have recognized him as the Tahoe windows were tinted. Captain Cooper testified that he recognized Harris as the driver of the Tahoe at an intersection. No evidence was offered to support Harris' theory that Captain Cooper could not see Harris behind the steering wheel.

Here, the totality of the circumstances reveal Captain Cooper approached the Tahoe to determine whether Harris was driving while his license was suspended. It was objectively reasonable for Captain Cooper to believe Harris was in violation of a traffic law when he observed Harris driving the Tahoe through an intersection in Sikeston.

Captain Cooper had knowledge that just two months earlier Harris was arrested for driving while suspended in the same vehicle. Although Harris wound up pulling into a driveway and stopping before Captain Cooper initiated a traffic stop, Cooper had probable cause to stop the Tahoe. Consequently, Captain Cooper was justified in approaching the Tahoe to investigate what he perceived to be a traffic violation. When Cooper approached the Tahoe, Harris was sitting behind the steering wheel immediately after the vehicle had been parked. When asked, Harris said he did not have a license. The undersigned concludes that it was objectively reasonable for Captain Cooper to believe that Harris was in violation of a traffic law when he saw Harris drive the Tahoe through an intersection in Sikeston. Once dispatch confirmed Harris' license was suspended, the officers arrested him for that law violation.

The Court finds that Harris' rights were not violated when Captain Cooper interacted with him while he was parked in a driveway and subsequently arrested.

**II.B. Seizure of the Handgun and Drugs**

When police conduct a lawful vehicle stop for a traffic violation, they may order the occupants to exit the vehicle without violating the Constitution. *See United States v. Beatty*, 170 F.3d 811, 813 (8th Cir. 1999). It is also well established "that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." *United States v. Webb*, 533 F.2d 391, 394 (8th Cir. 1976) (citing *Harris v. United States*, 390 U.S. 234, 236 (1968)). Under the plain view doctrine, an object may be seized by the police without a warrant if "(1) the officer did not violate the Fourth Amendment in arriving at the place from which

the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Collins*, 321 F.3d 691, 694 (8th Cir. 2003)).

"Once an officer has lawfully stopped a vehicle,. . .he can approach it even if all the occupants have been removed." *United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015) (citing *Beatty*, 170 F.3d at 814). Viewing the interior of the vehicle without entering it, does not constitute a search which would violate the Fourth Amendment. *Id*. "Hidden guns, even badly hidden guns, are by their nature incriminating." *United States v. Webb*, 533 F.2d 391, 394 (8th Cir. 1976) (citing *United States v. Hughes*, 940 F.2d 1125, 1127 (8th Cir. 1991) (noting that the "incriminatory nature of [a] gun and cocaine was immediately apparent"). *See also United States v. Kalter*, 5 F.3d 1166, 1168 (8th Cir. 1993) (warrantless seizure of a gun, following a routine traffic stop, was justified under the plain-view doctrine); *United States v. Willis*, 37 F.3d 313, 316-17 (7th Cir. 1994) (warrantless seizure of a gun from defendant's car justified under the plain-view doctrine).

Additionally, law enforcement may search a motor vehicle, even in the absence of a warrant or probable cause, if a person authorized to give consent does so. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Such consent is an exception to the Fourth Amendment's warrant requirement. *Id.*

The record supports that the owner of the Tahoe gave consent for the vehicle to be searched after Harris was arrested. Harris presented no contrary evidence.

In this case, Detective Whitney asked Harris to exit the Tahoe so that Harris could be placed under arrest. When Harris opened the driver's door, Detective Whitney saw the firearm and immediately instructed Harris not to touch the door and to place his hands behind his back. A few moments later, after the owner of the Tahoe gave consent for a search of the vehicle, several ounces of methamphetamine and other drugs were seized from the vehicle. Considering these circumstances collectively, the seizure of the handgun, drugs, and other items was lawful.

**II.C. The Defendant's Statements**

Harris alleges that his post-arrest statements were involuntary. He avers that his statements were made under duress. Harris claims he "simply said whatever he needed to say to get [his girlfriend] released" from jail. (Doc. 40 at 3.) The Government opposed that claim. (Doc. 41 at 6-7.)

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Perry*, 714 F.3d 570, 574 (8th Cir. 2013) (quoting *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004)). To determine whether a statement is voluntary, courts look at "the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011). Among the factors courts consider are "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education,

physical condition, and mental condition." *United States v. Wallace,* 713 F.3d 422, 426 (8th Cir. 2013) (quoting *Vega*, 676 F.3d at 718). The appropriate test for determining the voluntariness of a confession is "whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992) (quoting *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)). In analyzing the "overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressure to confess. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). A statement is not rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity. *Connelly*, 479 U.S. at 164, 167, 107 S.Ct. 515. "Misrepresentations on the part of the government do not make a statement per se involuntary." *Flittie v. Solem*, 775 F.2d 933, 945 (8th Cir. 1985), citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (confession voluntary even though police falsely told defendant that his companion had confessed). It is the government's burden to "prove by a preponderance of the evidence that the challenged statements were voluntary." *LeBrun*, 363 F.3d at 724).

The recording of Harris' post-arrest interview reflects that the officers advised Harris that they needed him to be honest and that they could not guarantee that his girlfriend would be released from custody even if he claimed ownership of all the drugs that were seized. The officers' explanation was "not so coercive as to deprive [Harris] of [his] ability to make an unconstrained decision to confess." *United States v. Astello*, 241 F.3d 965, 967 (8th Cir. 2001). The Eighth Circuit noted that "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." *Id.* "[T]he fact

that the tactics produced the intended result ... does not make [a] confession involuntary." *Id.* at 968. In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." *United States v. LeBrun*, 306 F.3d 545, 555 (8th Cir. 2002) (internal quotation omitted). "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.' " *Astello*, 241 F.3d at 967 (quoting *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993)). Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect ..., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary. *Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) (internal citations omitted). Rather, the coercive conduct must be "such that the defendant's will was overborne and his capacity for self-determination critically impaired." *Astello*, 241 F.3d at 967 (internal quotation omitted).

The recorded interview includes both audio and video. The contents of the recording provide convincing evidence that Harris knew and understood his rights, and he voluntarily answered questions after having been given the *Miranda* warning. Harris was extremely comfortable in communicating with the officers. He challenged their ability to charge him with any offense. Harris attempted to negotiate the release of his girlfriend with the police. In response to his efforts, the officers simply said that Harris needed to be honest and truthful with them about everything. They clearly stated that they could not promise the girlfriend's release even if Harris took responsibility for the drugs. The officers stated that they would need the whole story and the conclusions from

the investigation were what would dictate who is charged or not charged. Understanding all the potential consequences, Harris made a number of admissions although he was not inclined to answer all of the questions posed to him. In consideration of the record as a whole, the Court finds no evidence that Harris' statements were involuntary. Nor is there any evidence that his statements were the result of coercion, duress, threats, tricks, promises, or false pretenses. Harris' will was not overborne as the officers did not utilize his desire for his girlfriend to be released from jail in a coercive manner.

The undersigned finds that Harris' statements to the officers were made voluntarily and should not be suppressed.

**II.D. The Motion to Dismiss**

Harris also filed a Motion to Dismiss the Indictment alleging that it was not supported by adequate evidence. He claims that the evidence used to secure the Indictment was based on hearsay and evidence that was illegally seized. (Doc. 57.)

"As a general rule, an indictment is sufficient if it 'first, contains the essential elements of the charged offense and fairly informs a defendant of the charges against which he must defend, and second, enables him to plead double jeopardy as a bar to a future prosecution." *United States v. Just*, 74 F.3d 902, 903 (8th Cir. 1996) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). *See United States v. Pemberton*, 121 F.3d 1157, 1169 (8th Cir. 1997) (holding to same effect).

The Indictment in the instant case is a plain, concise, and definite statement of the essential facts constituting the offenses charged and complies in all respects with Rule

7(c) of the Federal Rules of Criminal Procedure. Moreover, the Indictment closely tracks the language of the underlying statutes and, therefore, is legally sufficient. *See United States v. Oakie*, 12 F.3d 1436, 1440 (8th Cir. 1993). *See also United States v. Pennington*, 168 F.3d 1060, 1064 (8th Cir. 1999) (rejecting as meritless sufficiency challenge to indictment that, although it alleged offense recognized by law, did not cite statute and did not use exact words in statute; language in indictment was sufficient to apprise defendant of charges and to allow him to prepare effectively for trial).

Additionally, "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3rd Cir. 2000) (alteration added) (holding that Fed. R. Crim. P. 12(b)(2) authorizes dismissal of an indictment on the grounds that its allegations are not sufficient to charge an offense but not on the grounds that the evidence is not sufficient to prove the charges).

> "In civil cases, of course, the summary judgment procedures contemplated by Federal Rule of Civil Procedure 56 may be utilized to test, pretrial, the sufficiency of the evidence to establish triable issues of fact; but there is no corollary in criminal cases. The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29 . . . [W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be."

*United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *DeLaurentis*, 230 F.3d at 661) (alterations in original).

Harris also argues that the evidence he believes was seized in his case is inconsistent with the charges contained in the Indictment. "It has long been settled that

an indictment is not open to challenge on the ground that there was insufficient evidence before the grand jury." *United States v. Nelson*, 165 F.3d 1180, 1182 (8th Cir. 1999) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for a trial of the charge on its merits. The Fifth Amendment requires nothing more.").

In light of the foregoing, the issues raised to support Harris' Motion to Dismiss fail. Should Harris wish to challenge the chain of custody of the evidence seized from his vehicle on March 9, 2017, he may do so during the trial of his case.

**III. Conclusion**

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 25) and Motion to Dismiss Indictment (Doc. 57) be **denied**.

Further, the parties are advised that they have until March 2, 2018, within which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 16th day of February, 2018.

Abbie Crites-Leoni

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE